Brett C. KIMBERLIN, Plaintiff,

v.

J. Michael QUINLAN, et al., Defendants.

Civ. A. No. 90–1549 (HHG).

United States District Court,
District of Columbia.

Aug. 6, 1991.

**2**

Robert C. Threlkeld, Howard T. Rosenblatt, Arnold & Porter, Washington, D.C., for plaintiff.

R. Joseph Sher, S. Trial Counsel, Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

## OPINION

HAROLD H. GREENE, District Judge.

This suit charges that, in the fall of 1988, just prior to the presidential election, the plaintiff, at that time an inmate at the El Reno Federal Correctional Institution in Oklahoma,[1] contacted national and local journalists to inform them that in 1971 he had sold marijuana to Dan Quayle, then a candidate for and now Vice President of the United States. The complaint further

---

1. Plaintiff is now incarcerated in Tennessee, serving a lengthy prison sentence for offenses involving drug smuggling and the use of explosives.

2. One of the motions is for dismissal or for summary judgment.

alleges that plaintiff was prevented from speaking to the journalists by being placed in an isolation cell, and that he was subsequently retaliated against when he persisted in his attempts to contact the press. The action is now before the Court on defendants' motions to dismiss.[2]

## I

### Factual Background

According to the complaint, Kimberlin was interviewed by NBC News on the afternoon of Friday, November 4, 1988, four days before the presidential election, and he was scheduled to have another interview, this time with a group of reporters, at 7:00 p.m. that same day. However, before the second interview could take place, defendant J. Michael Quinlan, the Director of the Bureau of Prisons, cancelled the meeting and ordered Kimberlin to be placed in administrative detention[3] where he remained until the next day. Two days after that, on Monday, November 7, the day before the presidential election, Kimberlin planned to address a conference of reporters in Washington, D.C. via telephone, but in the morning of that day he was again placed in detention, this time to be kept for seven days, until November 14. Kimberlin was placed in detention a third time, from December 22 until December 23, 1988.

Based on these events, Kimberlin has filed *Bivens*[4] actions against two government officials, Bureau of Prisons Director Quinlan, and Loye W. Miller, Jr., at the time Director of Public Affairs of the Department of Justice, in their individual capacities, for violating his rights under the First and Fifth Amendments. It is plaintiff's claim that it was the defendants' purpose, when issuing or participating in the issuance of the first two detention orders,

---

3. The removal from the general prison population is variously referred to herein as detention, administrative detention, placement in an isolation cell, or administrative segregation.

4. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

to prevent him from informing the press prior to the election about his transactions with Dan Quayle, and that the third detention was ordered in retaliation for his previous contacts with the press. In their motion papers, the defendants contest plaintiff's claims. Specifically, they assert that Kimberlin's first detention was effected for his own safety, and that the second and third detentions were ordered because the correctional authorities were investigating whether he had violated prison rules against making third-party telephone calls.[5] Defendants' Statement of Material Facts at 2–4.

In addition to the *Bivens* suit, Kimberlin has filed an action under the Federal Tort Claims Act (FTCA) against the United States and against Mr. Quinlan in his official capacity. It is charged in that action that the three detentions amounted to false imprisonment, and that Kimberlin's treatment by prison guards while he was in detention constituted assault and battery. Kimberlin also claims that prison officials monitored his telephone calls in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

Pending before the Court at this time is a motion by the defendants in their individual capacities to dismiss or for summary judgment in the *Bivens* action, and a motion by the government and by Director Quinlan in his official capacity to dismiss the Federal Tort Claims Act and Title III actions.

## II

### *Established Constitutional Rights*

Kimberlin's First Amendment *Bivens* claim hinges in large part on the motive of the government officials for placing him in administrative detention. While officials such as Quinlan and Miller have qualified immunity against suit, a plaintiff will prevail notwithstanding that immunity if he is able to prove that the officials were motivated by a purpose to violate rights that were clearly established at the time of the

conduct in question. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Martin v. D.C. Metro. Police Dep't.*, 812 F.2d 1425, 1431–33, *vacated in part on other grounds*, 817 F.2d 144, *en banc reinstated sub nom. Bartlett on behalf of Neuman v. Bowen*, 824 F.2d 1240 (D.C.Cir.1987).

For purposes of analysis, it is useful to determine first whether the conduct alleged by Kimberlin in light of the officials' alleged motivation violated a right that was clearly established at the time the conduct is alleged to have occurred. On that issue, the general rule is that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

Defendants argue that prison inmates do not have a right either to face-to-face press interviews or to telephonic press conferences, and that defendant's actions therefore did not violate plaintiff's rights under the First Amendment. It would follow, of course, that such a right was not clearly established at the time of the events in question.

However, plaintiff is not claiming that there is or was a general Bureau of Prisons policy banning these methods of press contact, or that such a policy, if it existed, would violate the First Amendment rights of inmates. Rather, it is his contention that the prison officials cancelled one previously approved face-to-face interview, prevented him from conducting other telephonic interviews, and retaliated against him for his previous contacts with the press—all not because these activities contravened a general prohibition on contacts with the press but because of the content of what he was expected to say to the journalists.

■ It was clearly established in November 1988 that, absent special circumstances, federal prison inmates have a First Amendment right to be free from governmental interference with their contacts with the press if that interference is based

---

**5.** A third-party call is a call placed to one person, who then uses a conference-line or call-forwarding capability to contact a person at another telephone number.

on the content of their speech or proposed speech. As early as 1975, the Court of Appeals for the Third Circuit ruled explicitly that the First Amendment prohibits prison officials from granting or denying a prisoner's interview with the press based on the content of that interview. *Main Road v. Aytch*, 522 F.2d 1080, 1086–87 (3d Cir.1975), where the court stated that the "First Amendment precludes [a prison official] from regulating, through the grant or denial of permission for prisoners to talk with reporters, the content of speech which reaches the news media, unless the restriction bears a substantial relationship to a significant governmental interest."

The Supreme Court decided about the same time that a prison regulation that restricts prisoners' contact with the press is valid but only "[s]o long as this restriction operates in a neutral fashion, without regard to the content of the expression." *Pell v. Procunier*, 417 U.S. 817, 828, 94 S.Ct. 2800, 2807, 41 L.Ed.2d 495 (1974). And it has likewise been decided that a prison regulation that operates in the area of inmates' First Amendment rights must have some rational connection with a legitimate governmental interest, and that regulation must "operate[ ] in a neutral fashion, without regard to the content of the expression." *Turner v. Safley*, 482 U.S. 78, 89–90, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987) (upholding ban on prisoner-to-prisoner correspondence in part because it was content-neutral). *See also, Bell v. Wolfish*, 441 U.S. 520, 551, 99 S.Ct. 1861, 1880, 60 L.Ed.2d 447 (1979) (upholding content-neutral regulation requiring that hard cover books be sent only by publishers).[6]

In sum, if the officials were motivated by a purpose to keep Kimberlin from speaking to the press because of the content of his expected communications, their conduct violated a well-established right, and qualified immunity would not attach to their actions.

6. An inmate also has a well-established right to be free from retaliation based on the content of his previous interviews with the press. *Burnham v. Oswald*, 342 F.Supp. 880, 889

## III

### *Heightened Pleading Requirements*

The next issue revolves around the motivation of the defendants: did they intend to keep Kimberlin from speaking to the press because they were concerned about what he might say? That issue must be examined from two perspectives: first, did the allegations of First Amendment violations in plaintiff's papers comply with the heightened pleading requirements established in this Circuit with respect to claims of this type?, and second, were plaintiff's allegations concerning defendants' intent or motive substantively sufficient to withstand defendants' motion to dismiss? In this section of the opinion, the Court examines the law respecting the heightened pleading requirement; in the next section, it considers the facts as they are alleged by plaintiff to determine their sufficiency under that pleading requirement and in light of the motion to dismiss as such.

█ The defendants argue that they should not be subjected to discovery and required to undergo a trial on the basis of mere general allegations of wrongdoing, and that is certainly correct. *See Whitacre v. Davey*, 890 F.2d 1168, 1171 (D.C.Cir. 1989); *Hobson v. Wilson*, 737 F.2d 1, 29, (D.C.Cir.1984). The law is, at least in this Circuit, that a plaintiff who makes a *Bivens* claim which alleges unconstitutional motive must meet what are called heightened pleading requirements when he is faced with a motion to dismiss. *Siegert v. Gilley*, 895 F.2d 797 (D.C.Cir.1990), *affirmed on other grounds*, —— U.S. ——, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Because the decision of the Court of Appeals in the *Siegert* case is central to a proper disposition of this part of the government's motion, it needs to be analyzed in some detail.

█ Siegert, a former employee of the federal government at St. Elizabeth's Hospital in Washington, D.C., brought a *Bi-*

(W.D.N.Y.1972); *Brooks v. Andolina*, 826 F.2d 1266, 1268 (3d Cir.1987); *Cavey v. Levine*, 435 F.Supp. 475 (D.Md.1977), *aff'd without opinion*, 580 F.2d 1047 (4th Cir.1978).

*vens* action alleging that his former superior had deprived him of liberty without due process by writing an allegedly defamatory letter in response to an inquiry by Siegert's prospective new employer. As in this case, the defendant moved for dismissal, or in the alternative for summary judgment, based on the defense of qualified immunity under *Harlow v. Fitzgerald, supra.* The District Court denied the motion and ordered limited discovery; the defendant appealed, and the court of Appeals reversed.

The appellate court, after first assuming without deciding that a violation of the plaintiff's constitutional rights had been adequately alleged, went on to hold that the plaintiff had failed to satisfy the heightened pleading standard required in cases of that kind. In this regard, the court stated that, upon the assertion of a qualified immunity defense the plaintiff will face dismissal unless he comes forward with specific factual allegations which establish improper intent. This ruling, of course, raises the question of precisely what kind of factual pleading or record is required. On that issue, the *Siegert* opinion is susceptible of more than one interpretation, as follows.

The majority of the Court of Appeals used several different formulations regarding the necessary requirement. At one place in the opinion, the court juxtaposed "direct" evidence with "circumstantial" evidence, stating that "merely circumstantial evidence of the intent" is insufficient to entitle a plaintiff to discovery. 895 F.2d at 802. Other language, however, contrasts "direct" evidence of an impermissible motive not with circumstantial evidence of such a motive, but with "conclusory" evidence or allegations (895 F.2d at 802), and it indicates that something "more tangible [in] the record" is required than "conclusory" allegations (895 F.2d at 804).

In short, at times the *Siegert* court states that allegations and evidence that are *circumstantial* will not suffice to satisfy the heightened pleading requirement, while elsewhere it suggests that it is *conclusory* allegations or evidence that are not enough. As will be seen below, in the present circumstances the two concepts cannot be considered identical. Moreover, although in *Siegert* the equation of circumstantial evidence with conclusory evidence [7] was immaterial to the outcome, in this case the distinction between these concepts is crucial, for as discussed below, while the record before the Court on the key issue of defendants' motive is circumstantial, it is also tangible and far from being merely conclusory.

Other judges involved with the *Siegert* case have expressed varying views on the meaning of the Court of Appeals' *Siegert* opinion. Thus, Judge Wald, the *Siegert* dissenter, expressed the belief that the heightened pleading standard, as formulated by the majority in that case, requires the plaintiff to plead "nonconclusory" facts (895 F.2d at 805) although elsewhere in her dissent, Judge Wald speaks of a requirement of more than "inferential or circumstantial" support for the unconstitutional motive allegations (895 F.2d at 807).

The Supreme Court did not rest its affirmance of the Court of Appeals on the issue of a heightened pleading requirement.[8] However, the majority opinion authored by Chief Justice Rehnquist construed the Court of Appeals opinion both as requiring "direct . . . as opposed to merely circumstantial" evidence and as requiring something "more tangible" than the plaintiff's affidavits. 111 S.Ct. at 1792–93. Justice Kennedy, in a separate concurrence, construed the Court of Appeals opinion as requiring "specific, nonconclusory factual allegations," but he went on to state his disagreement with what he regarded as the Court of Appeals' requirement of "direct, as opposed to circumstantial, evidence." 111 S.Ct. at 1795. Justice Marshall's dissenting opinion interpreted the Court of Appeals opinion as requiring "*direct* evidence of the unconstitutional

---

7. Similarly, the court equated direct or tangible evidence with nonconclusory evidence.

8. Instead, the Supreme Court held that the plaintiff's allegations, even if true, did not state a claim for violation of any constitutional right. 111 S.Ct. at 1794.

motive," contrasting that with what he regarded as Siegert's "highly specific circumstantial evidence" of such a motive. 111 S.Ct. at 1800, 1801 (emphasis in original).

Finally, the Solicitor General, in his brief to the Supreme Court in *Siegert*, stated that he did not believe that the opinion of the Court of Appeals "which focused primarily on the conclusory nature of petitioner's assertions," was in conflict with prior Supreme Court law holding (in *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954)), that circumstantial evidence is intrinsically no different than direct evidence.[9] Brief at pp. 20–21 n. 13.[10]

This Court has concluded, on the basis of the analysis *supra*, that Kimberlin meets the heightened pleading requirement established by *Siegert*, as long as the complaint, together with the supporting exhibits before the Court, present allegations that are tangible and nonconclusory, even if these allegations would properly be regarded as circumstantial (as distinguished from direct or testimonial). That is so because *Siegert* does not appear to have turned on the distinction between direct and circumstantial evidence as understood in the law of evidence, but on the question whether the plaintiff had proffered something other than mere conclusions, namely tangible allegations of concrete facts corroborative of his own subjective version of the events.

The Court will now turn to the allegations and the exhibits and examine them

both under the *Siegert* pleading requirement and in relation to the broader issue raised by the motion to dismiss: whether a motive to deprive plaintiff of his constitutional rights has been properly asserted.

## IV

### *Intention of the Officials*

■ It is plaintiff's contention that two of his administrative detentions were caused by the Bureau of Prisons' concern that he would speak to the press about his alleged sale of marijuana to then candidate Dan Quayle, and that the third detention constituted retaliation against him for having done so. The defendants argue in response that there were legitimate institutional reasons for the detentions, and that suppression of Kimberlin's speech regarding his alleged experiences with Dan Quayle had nothing to do with the measures taken. Plaintiff has replied in essence that the institutional reasons advanced by the defendants were mere pretexts. If plaintiff is correct in that conclusion, it would tend to show, circumstantially yet in tangible and persuasive fashion, that the defendants had the intent or motive requisite for a *Bivens* action. The Court will now examine the three Kimberlin detentions in that light.

First. According to defendants, Kimberlin was placed in administrative detention on November 4, 1988, in order to ensure his safety. That Bureau of Prisons concern, in turn, was asserted to have been triggered

---

**9.** The Solicitor General's view is supported, in addition to *Holland,* by a number of other precedents. *See, e.g., United States v. Clark,* 506 F.2d 416, 418 (5th Cir.1975) (the law makes no distinction between the weight to be given either to direct or to circumstantial evidence); *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 10, 5 L.Ed.2d 20 (1960) (circumstantial evidence is not only sufficient but may be more certain, satisfying and persuasive than direct evidence).

These principles are particularly apt where, as here, state of mind is at issue. *United States v. Jackson,* 513 F.2d 456, 461 (D.C.Cir.1975) ("Intent may, and generally must, be proved circumstantially...."); *United States v. Eaglin,* 571 F.2d 1069, 1076 (9th Cir.1977) (intent ordinarily may not be proved directly because there is no way of fathoming or scrutinizing the operations

of the human mind). In view of these legal principles, it is unlikely that the Court of Appeals meant in *Siegert* to exclude from consideration any and all circumstantial evidence as that term is understood in the law of evidence irrespective of its specificity and concreteness.

**10.** In the same vein, the Solicitor General went on to construe the Court of Appeals as holding in *Siegert* only that the plaintiff "may not rely solely on subjective allegations, ... attenuated inferential and circumstantial allegations, ... or otherwise conclusory allegations ... to support a claim of improper motive." Elsewhere his brief stated that it was not necessary to a resolution of the case by the Supreme Court to distinguish between circumstantial and direct proof as those terms are applied in the law of evidence.

by statements from Loye Miller, Director of Public Affairs at the Department of Justice, to the effect that he had been advised by Nina Totenberg, a reporter for National Public Radio, of a Kimberlin complaint to her that his safety was in jeopardy. However, according to a sworn declaration of Ms. Totenberg, she "had never said any such thing," and she had so informed Miller.[11]

Plaintiff further notes that, as the Bureau of Prisons concedes, Director Quinlan personally ordered Kimberlin's administrative detention, Exh. 1 to Plaintiff's Opposition, p. 2, and that this was the first time that the Director, who oversees some 45,-000 federal inmates nationwide, had made a decision to place an inmate in one of the many institutions under his control in administrative detention. Exh. 8, p. 9. Plaintiff contends that this extraordinary event corroborates his claim that the detention decision was not a routine security measure.[12]

Quinlan also personally cancelled Kimberlin's press conference. There is some question even from the defense side as to why he did that. Quinlan explained to Senator Joseph Biden that the holding of such a press conference was contrary to Bureau of Prisons policy. Exh. 3, p. 2. However, Miller has apparently stated that Kimberlin was "within his rights to have one according to the rules and regulations." Exh. 11, p. 73.

In his effort to show that his detention was not ordered out of concern for his safety, Kimberlin alleges next that, to get him to the detention cell, he was wrestled from his room, handcuffed, marched to detention in a painful position, and strip searched, the point being that these measures are inconsistent with administrative

segregation as a protection for his own safety.

Plaintiff finally relies on the fact that Miller was in continuous contact with Mark Goodin, Deputy Press Secretary to the Quayle campaign who, among other things, stated to Miller that Kimberlin's claims had to be taken seriously on account of its potential for adverse publicity; that he, Goodin, planned to be present with Quayle the day before the election to handle media inquiries regarding this subject; and that the closer to the election the story were to break the better the chance that it would have adverse effects. Exh. 5, p. 4; Exh. 11, p. 22. Here again, it is plaintiff's claim that attention would not have been paid to him at these high levels if nothing more than his own safety at an institution in Oklahoma had been at issue.

Second. As indicated, Kimberlin was released on November 5, but he was again placed in administrative detention on November 7, the day before the election. In the meantime, his phone conversations were monitored, First Amended Complaint at 14, and by this means the officials had learned that on that day Kimberlin proposed once again to telephone a group of reporters. Exh. 4, pp. 3–4, Exh. 5, p. 4. But that call was never made, for Kimberlin was placed in detention before it could be made. That detention, like the previous one, was also ordered personally by Director Quinlan. Exh. F to First Amended Complaint.

The justification given by the Bureau of Prisons for the second detention was that Kimberlin had made a third-party call.[13] However, plaintiff claims the pertinent regulations do not contemplate segregation as a sanction for making a third-party call;[14]

11. Exh. 4 to Plaintiff's Opposition, p. 2. Further, according to Ms. Totenberg, Kimberlin had told her by telephone on November 4 that he was concerned "about what the Justice Department might do to him." He was placed in administrative detention within an hour of his conversation with her. *Id.*

12. Along the same line, plaintiff notes that Miller discussed the Kimberlin efforts to talk to the press with the Executive Assistant to the Attorney General (and would have discussed it with

Attorney General Thornburgh himself had Thornburgh not been out of town). Exh. 5, p. 2.

13. *See* note 5, *supra.*

14. Further, an inmate may be placed in administrative detention pending investigation of alleged violation of prison regulations only "when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or

and Miller said that Kimberlin's second detention was a consequence of his intention to hold another press conference. Exh. 8, p. 9.

Third. Defendants justify Kimberlin's third detention, that of December 22, 1988, on the same basis as the second one, that is, that he had made a third-party call. But here again, there was no hearing and finding of guilt of the infraction prior to the detention as may be required by the regulations, and Kimberlin ultimately was found not guilty of misuse of the telephone. Plaintiff's claim that this detention was retaliatory or deterrent rests essentially on the timing of the event in that it occurred within a few days after press articles appeared concerning his problems at the institution on account of his contacts with the press. *See, e.g.,* Exh. F to First Amended Complaint (*New York Times* article dated December 20, 1988).

On the basis of these specific factual allegations, the Court concludes that the claims of constitutional violations made by plaintiff are (1) adequate to comply with the heightened pleading requirement of *Siegert,* and (2) otherwise sufficient to overcome defendants' motion to dismiss.

This obviously is not a final decision on the merits. The Court is not called upon at this time to determine whether, and it does not decide that, any particular claim made on behalf of plaintiff is true.[15] As noted, Quinlan, Miller, and others have provided their own explanations for the events upon which plaintiff relies, and several of these explanations are sharply at odds with those provided by plaintiff. It may be expected that defendants will hereafter provide more detailed evidentiary support for their version of the events. The Court only holds that plaintiff's allegations are sufficiently tangible, detailed, and nonconclusory that they support his request for a denial of the

motion to dismiss or for summary judgment.

Accordingly, the motion will be denied, the lawsuit may proceed, and plaintiff will be afforded the right to further discovery.

V

*Fifth Amendment Claims*

Plaintiff next claims that Quinlan and Miller violated his Fifth Amendment rights to substantive and procedural due process.

First. Not much need be said regarding substantive due process for, as defendants correctly argue, a violation in that regard must be viewed not under the rubric of generalized due process notions but in accordance with an explicit textual source of constitutional protection. *Graham v. Connor,* 490 U.S. 386, 393–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). This means that plaintiff's substantive due process claim depends upon and is coextensive with his First Amendment claim. The Court has denied defendants' motion to dismiss that claim, and it accordingly survives. No purpose would be served by a consideration in this case of two First Amendment claims, one directly and the other indirectly by way of the Fifth Amendment. On this basis, the motion to dismiss the Fifth Amendment substantive due process claim will be granted.

Second. With regard to the procedural due process claim, the mandatory language in the Federal Bureau of Prisons regulations on administrative detention (28 C.F.R. § 541.22) grant Kimberlin a liberty interest in remaining free from an administrative detention that is effected without compliance with these regulations. *See Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). However, the only procedure that was due Kimberlin under the circumstances presented by this

---

orderly running of the institution." 28 C.F.R. § 541.22(a). Kimberlin apparently was not at any pertinent time period regarded as a serious threat in any of these respects.

15. Similarly, the Court's decision on the motion to dismiss does not constitute any ruling with regard to Kimberlin's claim that he had sold

marijuana to Dan Quayle. Indeed, even if the defendants' motivation was as plaintiff says it was, it would not necessarily prove that there was a sale of marijuana; the defendants could have desired to keep the Kimberlin allegations from the press and the public just prior to the election whether or not they were true.

case was an informal, non-adversary review of the basis for his detentions within a reasonable time after they began. *Hewitt, supra,* 459 U.S. at 472, 103 S.Ct. at 871.

■ As indicated above, Kimberlin was detained on three occasions. Two of the detentions (November 4–5; and December 22–23) were of very short duration. In both instances, he was released within twenty-four hours of being detained. The Court finds that under the *Hewitt* standard, Kimberlin was released with sufficient dispatch on both of these occasions, and that whatever review the prison officials provided conformed to *Hewitt.*

As concerns the remaining detention, that of November 7, the complaint alleges that Kimberlin was released after seven days, when a local disciplinary hearing officer determined that the alleged violation did not carry the sanction of segregation from the general prison population. First Amended Complaint at 17. This decision by the officer was likewise sufficiently speedy for due process purposes. See *Hewitt, supra,* where the Supreme Court held that prison officials are to be accorded wide-ranging deference in the adoption of policies and practices that, in their judgment, are needed to preserve prison order and discipline. The Court went on to say that such officials are obligated only to engage in an informal review of the information supporting the inmate's administrative confinement "within a reasonable time after confining him to administrative segregation." 459 U.S. at 472, 103 S.Ct. at 872. It so happens that the inmate in *Hewitt* did not receive even an informal review until five days after his administrative detention, and that he remained in that detention for a considerable period thereafter. Nevertheless, the Supreme Court approved the actions of the officials. Under the standards established by the Supreme Court, Kimberlin was not deprived of procedural due process.

16. Plaintiff has satisfied the administrative claim requirements of the Federal Tort Claims Act.

For the reasons stated, the Fifth Amendment claims will be dismissed.

## VI

### *Federal Tort Claims Act*

Plaintiff next claims that he is entitled to damages under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), 1402(b), 2671 *et seq.*[16] This entitlement is claimed to be based on his false imprisonment and the assault and battery, stemming from Director Quinlan's order that he be placed in administrative detention, and his handling by the prison guards while they took him to that detention. The government has moved to dismiss these claims on the basis of improper venue.

The statute lays venue of FTCA claims only in the "district where the plaintiff resides or wherein the act or omission complained of occurred." 28 U.S.C. § 1402(b). Since plaintiff does not reside in the District of Columbia, the issue is whether, under the standards established by cases, the acts complained of may be said to have occurred in this District.

■ The government relies principally upon *Reuber v. United States,* 750 F.2d 1039 (D.C.Cir.1984). In that case, where a letter of reprimand concerning the plaintiff was written and circulated in Maryland, the Court of Appeals held venue in the District of Columbia to be improper even though it appeared that the letter was eventually leaked and posted on a bulletin board in this District. The court reached that result because the plaintiff could "point to *no act* in the District by *any government employee* that caused him any tortious injury," 750 F.2d at 1046–47 (emphasis added).[17]

In the view of this Court, *Reuber* is not dispositive of the venue issues here. Unlike in that case, the plaintiff here has claimed that officials and other employees of the United States committed acts in this District that caused him injury. Specifical-

17. The events in the District of Columbia could have been entirely the work of private persons, not connected with the government, and the United States therefore could not be held responsible in a FTCA claim.

ly, the complaint alleges that Kimberlin was falsely imprisoned, *i.e.*, placed in administrative detention, as a result of a conspiracy led by Director Quinlan in Washington, D.C. While the allegation of a conspiracy including officials in Washington would not, by itself, be sufficient to confer venue here,[18] the conspiracy allegation is here fleshed out with respect to the alleged false imprisonment by specific claims that Quinlan personally ordered Kimberlin held in administrative detention on November 4 and 7, 1988; that Quinlan falsely informed regional Bureau of Prisons officials that Kimberlin had told a member of the press that his life was in danger; and that Quinlan on November 7, 1988 approved and ratified Kimberlin's second administrative detention.[19]

In short, Kimberlin's papers allege that the impetus for his administrative detentions came from Washington, D.C., where Director Quinlan ordered that Kimberlin be detained. Based on these allegations, the Court finds that there is a sufficient nexus between the false imprisonment claim and the District of Columbia for venue to be proper here with respect to that claim.

■ On the other hand, the Court concludes that venue does not lie in the District of Columbia with respect to the assault and battery claim. To be sure, plaintiff argues in his opposition to the motion to dismiss that the facts alleging false imprisonment are closely intertwined with those alleging assault and battery, and that "[i]n ordering Kimberlin into confinement, Quinlan [in Washington] is responsible for the foreseeable consequences of his actions, including the assault and battery...." Memorandum in Opposition at 16 n. 5. The present situation involves a statutory waiver of sovereign immunity; that waiver specifies precisely in which courts venue is proper; and the venue pro-

vision must therefore be strictly construed. The Court will not conclude that venue is appropriate in this District on the assault and battery charges, since in essence the plaintiff is relying only on the presence here of alleged conspirators and on implications arising from claimed foreseeability.[20] For these reasons, the motion to dismiss will be denied with respect to the FTCA false imprisonment claim but granted with respect to the assault and battery claim.

## VII

### *Claims Under the Omnibus Crime Control and Safe Streets Act*

■ Kimberlin finally claims that prison officials monitored his use of the telephone, and that this monitoring violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. § 2511. The Title III claim names Director Quinlan and the Bureau of Prisons as defendants. While the government argues to the contrary, it is established that Title III applies to prisons and prison inmates. *United States v. Amen*, 831 F.2d 373, 378 (2d Cir.1987); *Campiti v. Walonis*, 611 F.2d 387, 392 (1st Cir.1979); *compare United States v. Paul*, 614 F.2d 115, 117 (6th Cir. 1980).

■ The government also contends that Kimberlin consented to the monitoring of his phone calls by using prison phones, *see Amen*, 831 F.2d at 378; *Paul*, 614 F.2d at 117; 18 U.S.C. § 2511(2)(c), and that the monitoring was valid under the statute because it was performed by a "law enforcement officer in the ordinary course of his duties." 18 U.S.C. § 2510(5)(a).

Consent may be implied, the government argues, from the fact that Kimberlin had constructive notice of the monitoring, because the Code of Federal Regulations authorizes telephone monitoring in prisons.

**18.** Conspiracy allegations are often made, particularly by inmates, even when there is no factual basis therefor.

**19.** There are also additional allegations which could conceivably support venue here, but their relationship to individuals in the District of Columbia is at this juncture not sufficiently clear.

**20.** It is quite possible that the prison guards were acting on their own when they allegedly roughed up Kimberlin in the course of his transfer to administrative detention. The complaint does not allege otherwise. Certainly, the Court is unable, without more, to assume foreseeability insofar as Quinlan is concerned.

28 C.F.R. § 540.101. But that same regulation requires the warden to "provide notice to the inmate of the potential for monitoring." Under the circumstances of this case, the Court will not infer consent unless it can be shown that the warden gave notice to Kimberlin, alone or in conjunction with others, that the monitoring system was in place. Accordingly, before the Court would be justified in dismissing this claim, there would have to be a factual record on the notice question. Similarly, a factual record will have to be made on the issue of whether the monitoring of Kimberlin's calls occurred in the "ordinary course" of law enforcement duties. *Paul*, 614 F.2d at 117.

The motion to dismiss with respect to the Title III claim will therefore be denied, but that denial will be without prejudice to the filing of a motion for summary judgment upon the development of a further factual record.