**Brett C. KIMBERLIN, Plaintiff,**

v.

**Michael J. QUINLAN, et al., Defendants.**

**No. CIV.A. 90–1549 EGS.**

United States District Court, District of Columbia.

March 3, 2003.

Howard T. Rosenblatt, Washington, DC, for Plaintiff.

---

11. An Order consistent with the Court's ruling accompanies this Memorandum Opinion.

R. Joseph Sher, Esquire, United States Department of Justice, Civil Division, Michael Lee Martinez, Esquire, Crowell & Moring, L.L.P., Washington, DC, for Defendants.

Stuart Fries Pierson, Troutman Sanders, LLP, Washington, DC, for Movant.

### MEMORANDUM OPINION AND ORDER

SULLIVAN, District Judge.

Defendants Michael J. Quinlan, the former Director of the Bureau of Prisons ("BOP"), and Loye M. Miller, the former Chief of Public Affairs for the Department of Justice, move for summary judgment on plaintiff's claims against them in their individual capacities. Plaintiff, Brett Kimberlin, filed this lawsuit in 1990 against defendant Quinlan in his individual and official capacities, defendant Miller in his individual capacity, and the United States of America. Plaintiff contends, *inter alia*, that defendants violated his First Amendment rights. In 1998, this Court dismissed all claims against the United States of America and against defendant Quinlan in his official capacity.

The narrow issue presented to this Court in considering defendants' motion for summary judgment is whether plaintiff has presented sufficient evidence to establish a dispute as to the defendants' role in, and motivation for, the cancellation of plaintiff's interviews with the press and his placement in administrative detention. The Court finds that the factual record presented by the parties is riddled with genuine issues of material fact, precluding entry of summary judgment for defendants.

## I. Background

### A. Factual Background

Although the underlying facts of this case have been outlined numerous times by both the District Court and the Court of Appeals, the facts are key to this Court's analysis and, thus, the Court will add to the existing descriptions of the events engendering this litigation. Because plaintiff here must show that, when reasonable inferences are drawn in his favor, the record would support a finding that the defendants acted with improper motive, the Court pays particular attention to the factual record, which plaintiff contends supports his claims.

In late October 1988, in the days leading up to the 1988 presidential election, plaintiff Brett Kimberlin, a federal prison inmate incarcerated at the Federal Correctional Institution at El Reno, Oklahoma, began informing members of the press that he had sold marijuana to then Republican vice-presidential candidate, Dan Quayle, during the 1970s. *See* Totenberg Decl. at ¶¶ 2–3.

Nina Totenberg of National Public Radio learned of Mr. Kimberlin's allegations "about 2 weeks before the election," and the following week, "other news organizations learned about Kimberlin." *Id.* There was interest from journalists in the plaintiff's allegations and plaintiff spoke with the reporters over the telephone, an activity which did not require prison approval.

On November 3, 1988, five days before the presidential election, NBC News requested permission from the prison to interview Mr. Kimberlin in person and on camera. Copeland Dep. at 28–29. This was the first time that a news organization had asked a government official for permission to interview Mr. Kimberlin.

NBC's request was relayed to the Director of BOP in Washington, D.C., defendant J. Michael Quinlan, as well as to at least one of his superiors. NBC was initially refused permission to interview Mr. Kimberlin until after the election. Pl.'s Ex. 4 at 2. In response, the network

threatened to broadcast plaintiff's allegations unless permitted to conduct the interview. Defendant Quinlan later wrote the Associate Attorney General:

The NBC staff member attempting to set up the interview explicitly told Bureau staff that if they were not granted prompt access to Kimberlin, the network would run a story with the additional twist that the Bureau was preventing the interview until after the election to protect the Quayle candidacy.

*Id.*

Deputy Associate Attorney General Copeland testified at his deposition that, after the NBC request for an interview, plaintiff was to be placed in administrative detention. He described his recollection of a report that he received from defendant Quinlan or one of his immediate subordinates, who claimed to have received information from the warden at plaintiff's institution. He stated:

Well, see, my recollection was that that may have been part of the initial report. This guy made these allegations, NBC has got them, they want to follow up, but under our rules he's violated our procedures and therefore we've put him in administrative detention.... That was the action they were about to take with respect to him.

Copeland Dep. at 51–52, 56. Plaintiff argues that it is a reasonable inference from Mr. Copeland's statements to conclude that NBC's demand was one of the reasons for plaintiff's subsequent placement in administrative detention.

While Mr. Quinlan ultimately allowed the NBC interview to proceed, that decision was in part motivated by his assessment that "Kimberlin's fundamental lack of credibility" made broadcast of his "allegations before the election unlikely." Pl.'s Ex. 4 at 2. Yet, Mr. Quinlan's superior, then-Associate Attorney General Frank Keating, acknowledged that an inmate's credibility should be irrelevant to any decision to permit press access. *See* Pl.'s Ex. 7, at 25 (Keating Dep.). While NBC ultimately did not air the interview with plaintiff, a local Oklahoma newspaper printed a front-page story on November 4, 1988. The story was titled "Quayle Probe Comes to El Reno," and reported the nature of Mr. Kimberlin's allegations, and that he had been interviewed by NBC. Pl.'s Ex. 10.

Following news of the NBC interview, numerous reporters contacted the prison. Local prison officials determined that a single interview session, which they called a "group interview," would best accommodate the press and be consistent with prison management needs. Pl.'s Ex. 6, at 144–46 (Hershberger Dep.). The Acting Warden, Greg Hershberger, determined that "the easiest way for the institution to resolve the situation was to have everybody come in, talk to this guy; get it over with; get him out of our hair and get them out of our hair than to have to be piecemealing it one at a time over a period of several days or weeks. That's why I made the decision." *Id.* at 144. The prison scheduled this group interview for 7:00 p.m. on November 4, 1988, the Friday before the Tuesday election.

Mr. Kimberlin's telephone conversations on November 4 were intercepted and recorded. In these conversations, he revealed that he intended to tell the press of his own allegations regarding the vice-presidential candidate, as well as of the existence of a "DEA file in Washington on Quayle." Defs.' Ex. 32, at 18–19 (transcript of plaintiff's conversation with an investigative journalist named Cody Shearer).

Bush–Quayle Campaign officials have acknowledged that they were alarmed by Mr. Kimberlin's eleventh-hour allegations. Specifically, they were concerned with

plaintiff's plan to hold a press conference on the eve of the election. *See, e.g.,* Pl.'s Ex. 12 at 46, 48–49 (Spencer Dep.); Pl.'s Ex. 11 at 75 (Goodin Dep.). Mark Goodin, the Deputy Press Secretary of the Quayle Campaign, called Loye Miller, then-Director of Public Affairs at the Justice Department. According to Mr. Goodin, he told Miller: "This Kimberlin fellow apparently is going to have a press conference. I'm amazed." Pl.'s Ex. 11 at 73. Miller responded: "Well, amazed or not, he's going to have one. It's within his rights to have one according to the rules and regulations." *Id.*

Mr. Miller, however, denies this conversation. Rather, he states that Mr. Goodin noted that the closer to the Tuesday election that the story were to break, the more attention it was likely to receive. *See* Pl.'s Ex. 19 at 4. Mr. Goodin testified that Mr. Miller agreed to keep the Bush–Quayle Campaign apprised of plaintiff's activities. Further, he testified that Mr. Miller explained that "he was receiving his status reports from the Bureau of Prisons" and that he "was going through a chain of command on it as well." Pl.'s Ex. 11 at 91.

Mr. Miller admits that publication of Mr. Kimberlin's allegations prior to the election would have resulted in a sensational news story. *See* Pl.'s Ex. 18 at 15, 70 (Miller Dep.). At least in part because of the political sensitivity of the impending press conference, Mr. Miller promptly alerted the Executive Assistant to Attorney General Thornburgh of plaintiff's plan to have a press conference. *Id.* at 63. Mr. Miller also called BOP. Pl.'s Ex. 19 at 1. The Bush–Quayle campaign also contacted BOP headquarters.

Director Quinlan personally cancelled plaintiff's press conference within an hour or two of learning of it. Plaintiff contends that Director Quinlan cancelled the conference after receiving telephone calls from Mr. Miller and the Bush–Quayle campaign.

According to Mr. Goodin, Director Quinlan promptly notified him and the Quayle Campaign that the press conference had been canceled. Pl.'s Ex. 11 at 78–79.

Director Quinlan states that he cancelled the press conference because it violated an unwritten BOP "policy." Pl.'s Ex. 20 at 2. However, plaintiff contends that no such policy existed at the time of the events in question. Indeed, Mr. Miller informed Mr. Goodin that it was within plaintiff's rights to have such a conference. Plaintiff relies on testimony from other BOP officials acknowledging that no policy prohibited inmate press conferences. *See, e.g.,* Pl.'s Ex. 23 at 17 (Martin Dep.); Pl.'s Ex. 6 at 152–55 (Hershberger Dep.).

A few hours after Mr. Quinlan cancelled the press conference, Mr. Kimberlin was locked into an isolated detention cell commonly known among staff and inmates as "the hole." *See* Pl.'s Ex. 26 at ¶¶ 6, 10 (Kimberlin Decl.); Pl.'s Ex. 6 at 90 (Hershberger Dep.). Mr. Quinlan personally ordered plaintiff's confinement. *See* Pl.'s Ex. 8 at 102 (Quinlan Dep.); Pl.'s Ex. 16 at 2. During his deposition, Mr. Quinlan stated that he issued the order for plaintiff's detention because he was concerned for plaintiff's "safety." Pl.'s Ex. 8 at 101. Mr. Quinlan made a late-night phone call from his hotel in Chicago to prison officials, in which he instructed that Mr. Kimberlin be locked in administrative detention. *Id.* at 101–02. Following Mr. Quinlan's phone call, prison officials ordered plaintiff into administrative detention at approximately 11:00 p.m. Central Time. Def.'s Ex. 19 at 56–59 (Benefiel Dep.). While defendants argue that Mr. Quinlan "made no inquiries to anyone . . . as to what Kimberlin would say to the press" before ordering his confinement, Mr. Quinlan has acknowledged that he knew the contents of plaintiff's allegations regarding candidate Quayle prior to the

NBC interview held at the prison that morning. *See* Pl.'s Ex. 8 at 93–94.

Mr. Quinlan's stated belief that plaintiff was in danger stems from a phone call that plaintiff argues was made to Mr. Quinlan by Mr. Miller. Mr. Quinlan claims that his confinement order rested solely on information that he received that Mr. Kimberlin perceived he was in some danger.

Ms. Totenberg testified:

What I remember very specifically is that—is [Miller] trying to tell me I was the basis for the Department of Justice believing that Mr. Kimberlin's life was in danger from fellow inmates and I told him that was a goddamn lie, I believe. And if that was the re[e]d he was leaning on, he should get him out of solitary right away because it wasn't going to hold up.

Pl.'s Ex. 3 at 99 (Totenberg Dep.).

Ms. Totenberg also executed a sworn declaration in which she confirmed: "In one conversation with Miller, it became clear to me that the Department was using me as the excuse for the isolation—that I was supposed to be the person who quoted Kimberlin as saying his life was in danger. I immediately told Loye Miller that was untrue and that I had never said any such thing." Pl.'s Ex. 2 at 16.

Yet, Mr. Miller has testified that any comments that Ms. Totenberg made to him regarding the prison guards' treatment of Mr. Kimberlin he "did not take ... seriously." Pl.'s Ex. 19 at 4. Plaintiff contends that, following Mr. Miller's conversation with Ms. Totenberg, Mr. Miller called at least three high-ranking BOP officials in the middle of the night to warn them of a danger to plaintiff. Plaintiff contends that Mr. Miller called the BOP Regional Director and a Public Affairs official at BOP headquarters, *see* Pl.'s Ex. 9; Pl.'s Ex. 18 at 130–31 (Miller Dep.), and that he called Mr. Quinlan at a hotel in Chicago.

Mr. Miller denies speaking with Mr. Quinlan on the night in question. *See* Pl.'s Ex. 18 at 130–31 (Miller Dep.). However, plaintiff points to the deposition testimony of James Jones, the BOP Public Affairs Director, who averred that Mr. Miller had stated to him in a phone conversation on the evening of November 4 that "he had talked to Director Mike Quinlan and passed on to him information from Nina Totenberg that she had received ... that Inmate Kimberlin felt like he was in jeopardy or words to that effect and he indicated that she had passed that to him and that he passed that along to Mike Quinlan." Pl.'s Ex. 31 at 64–65 (Jones Dep.). Further, Mr. Jones testified that he then called Mr. Quinlan, who acknowledged that "Loye Miller had contacted him and passed along this information about Inmate Kimberlin and that he had contacted the regional director, J.D. Williams, and passed that information along to him to pass to the warden at El Reno." *Id.* at 68–69. Defendants, however, point to a recently executed affidavit by Mr. Jones that states that he has no "personal knowledge" of a phone conversation between Mr. Quinlan and Mr. Miller.

The acting warden of the prison at El Reno stated that his lieutenant informed him that there did not appear to be a threat to Mr. Kimberlin's safety. Def.'s Ex. 36 at 172 (Hershberger Dep.). He further testified that he received a phone call at home on the evening of November 4 informing him that, as a result of the phone call from Mr. Williams, prison personnel had placed Mr. Kimberlin in administrative detention. *Id.* at 172–74.

When plaintiff was placed in administrative detention, he was also prohibited from using the telephone. An order provided: "NO! MORE CALLS FOR THIS INMATE, per Lt. Garvue." Pl.'s Ex. 27 (emphasis in original). Lieutenant Garvue

does not recall giving this order. *See* Pl.'s Ex. 28 at 17–18 (Garvue Dep.). No other official has acknowledged responsibility for this order.

Upon plaintiff's release from administrative detention, he made plans to telephone a group of news reporters to discuss his claims. Pl.'s Ex. 26 ¶ 12 (Kimberlin Decl.). The reporters arranged to receive plaintiff's phone call at a hotel in Washington, D.C. at 10:00 a.m. on Monday, November 7, the morning before the election. BOP officials discovered plaintiff's intentions by monitoring his telephone conversations.

Bush–Quayle Campaign officials were aware of the planned call and made Mr. Miller aware of their concerns regarding the call. Pl.'s Ex. 12 at 86 (Spencer Dep.); Pl.'s Ex. 19 at 4 (Miller letter).

Approximately 15 minutes before plaintiff's phone call was scheduled to take place, he was returned to detention and barred from calling any reporters until after the election. *See* Pl.'s Ex. 1 at 169–70 (Kimberlin Dep.).

Following the confinement of Mr. Kimberlin, Mr. Quinlan explained that the phone call was cancelled and plaintiff placed in detention because plaintiff had attempted to use a "call forwarding system" that violated prison rules. *See* Pl.'s Ex. 4. Plaintiff's detention lasted seven days. On the seventh day, November 14, he was given a hearing on the telephone violation. He was found to have made a "third-party" call, but was immediately released from detention and his "good time" credits were later restored. Pl.'s Ex. 37. The seven-day delay was attributed to a need for an "investigation" of whether plaintiff previously had made a third-party call. Pl.'s Exs. 37, 38. Yet, as the Acting Warden acknowledged, a third-party call would generally lie "at the lowest level of our disciplinary code." Pl.'s Ex. 6 at 25–26 (Hershberger Dep.).

With respect to the planned telephone call, Mr. Miller indicated that the "Bureau of Prisons caught on that [plaintiff] was going to hold another press conference, so they put him back in," and that it "was certainly my understanding at the time that it was this attempt to hold an unauthorized press conference which directly caused him to be segregated once again." Pl.'s Ex. 24 at 9; Pl.'s Ex. 19 at 5.

Mr. Miller further told the *New York Times* that Director Quinlan ordered this second period of confinement: "[Miller] said Kimberlin was twice placed in administrative detention on the order of J. Michael Quinlan, head of the Federal Bureau of Prisons." Pl.'s Ex. 41. Director Quinlan states only that he was advised of the decision to place plaintiff in detention when it occurred, and was in a position to approve or disapprove the decision. Pl.'s Ex. 8 at 190. No prison official, however, has admitted to making the decision to place plaintiff in detention for the second time.

On December 22, 1988, plaintiff was again placed in administrative detention. The basis for this detention was again the allegation that plaintiff had made a "third-party" call. Plaintiff was ultimately found not guilty of this violation and released. Pl.'s Ex. 44. Plaintiff contends that this detention was a result of Mr. Quinlan's personal involvement in stopping the November 4 and November 7 press interviews. However, plaintiff does not provide evidence of any direct involvement of Mr. Quinlan or Mr. Miller in the December 22 detention.

## B. Procedural History

Plaintiff Brett Kimberlin filed this lawsuit in 1990, alleging that defendants Quinlan and Miller violated his First Amendment rights. Defendants Quinlan and Miller moved to dismiss or for sum-

mary judgment, arguing, among other things, that they were entitled to qualified immunity. Defendants' arguments regarding qualified immunity rested on the "heightened pleading" standard that was the law of this Circuit at the time. In 1991, the Honorable Harold H. Greene of this Court held that, under the "heightened pleading" standard, genuine issues of material fact existed that precluded an entry of summary judgment for defendants. *See Kimberlin v. Quinlan,* 774 F.Supp. 1, 6–8 (D.D.C.1991) (*Kimberlin I* ). The Court also held that Kimberlin alleged a violation of a right that was "clearly established at the time the conduct" occurred. *See id.* at 3, 4.

Defendants filed an interlocutory appeal from Judge Greene's ruling. In 1993, a divided panel of the Court of Appeals reversed, finding that plaintiff had failed to satisfy the then-applicable heightened pleading standard. *Kimberlin v. Quinlan,* 6 F.3d 789, 796 (D.C.Cir.1993) (*Kimberlin II* ). Plaintiff filed a petition for rehearing and for rehearing *en banc,* but those petitions were denied. *See Kimberlin v. Quinlan,* 17 F.3d 1525 (D.C.Cir.1994).

Plaintiff then filed a petition for *certiorari* with the United States Supreme Court, which was granted. The case was fully briefed and argued before the Supreme Court. However, the Supreme Court vacated the Court of Appeals decision without opinion and remanded the case for further consideration in light of the Supreme Court's decision in *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). *See Kimberlin v. Quinlan,* 515 U.S. 321, 115 S.Ct. 2552, 132 L.Ed.2d 252 (1995).

In *Johnson,* the Supreme Court held that government officials who assert qualified immunity cannot immediately appeal the denial of summary judgment "insofar as that order determines whether or not the pretrial record sets forth a 'genuine'

issue of fact for trial." 515 U.S. at 320, 115 S.Ct. 2151; *but see Behrens v. Pelletier,* 516 U.S. 299, 313, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) ("*Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable.").

On remand from the Supreme Court, and following a new round of briefing, the Court of Appeals dismissed defendants' appeal and remanded the case to the District Court. *Kimberlin v. Quinlan,* Civ. A. No. 91–5315, 1995 WL 759464 (D.C.Cir. Nov. 8, 1995). Defendants Quinlan and Miller petitioned for rehearing and rehearing *en banc,* but those petitions were denied. No. 91–5315 (D.C.Cir. Jan. 26, 1996). The case was remanded to the District Court for conclusion of discovery.

After discovery was completed, defendants again moved for summary judgment on the basis of qualified immunity. While defendants' motion was pending, the Supreme Court issued its opinion in *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998), holding that there is no heightened pleading standard for *Bivens* claims.

In 1998, seven years after his first ruling on defendants' summary judgment motion, Judge Greene dismissed all claims against the United States and against defendant Quinlan in his official capacity. *See Kimberlin v. Quinlan,* Civ. Action No. 90–1549, Mem. Op. (D.D.C. Oct. 21, 1998) (*Kimberlin III* ). However, the Court denied qualified immunity on plaintiff's claims against defendants Quinlan and Miller in their individual capacities. *Id.* The Court found that defendants Quinlan and Miller had acted with an improper First Amendment motive in cancelling plaintiff's press conference and having him placed in detention. In so doing, the District Court held that its finding that the defendants had violated clearly established law was the "law of the case" because it had been

unchallenged in defendants' first appeal. However, the Court did not analyze whether defendants' conduct was objectively reasonable as measured against the clearly established law. *Id.* Defendants Quinlan and Miller filed a second interlocutory appeal.

The Court of Appeals affirmed the District Court's application of the "law of the case" doctrine, and held that plaintiff had a "clearly established right 'to be free from governmental interference with [his] contacts with the press if that interference is based on the content of [his] speech of proposed speech.'" *Kimberlin v. Quinlan,* 199 F.3d 496, 502 (D.C.Cir.1999) (*Kimberlin IV*) (quoting *Kimberlin I,* 774 F.Supp. at 3–4).

However, the Court of Appeals remanded the case to the District Court for a determination of whether defendants Quinlan and Miller had acted with the requisite motive.[1] The Court of Appeals explained the remaining issues facing the District Court as follows:

> The District Court must now determine whether there are disputed issues of fact as to whether appellants violated the clearly established law either by intentionally segregating Mr. Kimberlin from the general prison population or by interfering with his press contacts on account of the content of his speech. In particular, the District Court must inquire whether Mr. Kimberlin has identified affirmative evidence from which a jury could find that he has carried his burden of proving the pertinent motive.

199 F.3d at 498.

The Court of Appeals instructed the District Court to consider whether defendants had demonstrated an "objectively valid reason for their actions." *Id.* at 502. The Court of Appeals indicated that, in

considering any objectively valid reasons proffered by defendants, the District Court should apply the test set forth in *Wilson v. Layne,* 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), in which the Supreme Court asked "whether a reasonable officer could have believed" that her conduct was lawful in light of clearly established law and the information possessed by the officer. *Id.* at 502–03. The Court of Appeals found that "[t]he analogous question in this case has already been answered: the District Court has found that no reasonable prison official could believe that interfering with an inmate's access to the press because of the content of the inmate's speech could be lawful." *Id.* at 503. Accordingly, this Court "must now weigh the evidence to determine if there are disputed issues of fact as to whether appellants were motivated by improper intent." *Id.*

Indeed, the Court of Appeals directed that, in the event that the defendants were able to show an objectively valid reason for their conduct, the District Court "must still inquire into whether there is a disputed issue of fact as to whether appellants [Quinlan and Miller] were actually motivated by an illegitimate purpose." 199 F.3d at 502. The Court relied on *Crawford–El* to reject the dissenting opinion of Judge Henderson, which would "immunize all officials whose conduct is 'objectively valid,' regardless of improper intent." *Id.* (citing to 523 U.S. at 593–94, 118 S.Ct. 1584).

The Court of Appeals cautioned that the District Court is "not foreclosed from issuing a summary judgment for appellants [Quinlan and Miller] merely because Mr. Kimberlin's claim rests on [Quinlan's and Miller's motive]." *Id.* at 502. "The Supreme Court has expressed faith in the experience of District Court judges to

---

1. At that time, the case was randomly reassigned to this Court on May 7, 1999, due to the unavailability of the Hon. Judge Harold

H. Greene, who died while the case was before the Circuit on appeal.

manage cases involving allegations of improper intent in a way that will allow for summary judgment in appropriate cases." *Id.*

Defendants filed a petition for rehearing *en banc* of the Court of Appeals' decision. This petition was denied. 207 F.3d 667 (D.C.Cir.2000). Defendants also filed a petition for writ of *certiorari* in the Supreme Court. That petition was also denied. *Quinlan v. Kimberlin,* 531 U.S. 871, 121 S.Ct. 172, 148 L.Ed.2d 118 (2000).

## II. Analysis

### A. Legal Standard for Summary Judgment

Summary judgment is granted pursuant to Fed.R.Civ.P. 56 only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court views the evidence in the light most favorable to the nonmoving party, according that party the benefit of all reasonable inferences. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, in ruling on a motion for summary judgment, the Court will grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not in dispute.

### B. Genuine Issues of Material Fact Preclude Entry of Summary Judgment

The Court of Appeals has clearly delineated the relevant inquiry for this Court. Specifically, this Court must determine if genuine issues of material fact exist which would permit a reasonable juror to conclude that defendants Quinlan and Miller were motivated by improper intent when they engaged in conduct interfering with plaintiff's freedom of speech.

In *Crawford–El,* the Supreme Court held that, to rebut a claim of qualified immunity, a plaintiff must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." 523 U.S. at 600, 118 S.Ct. 1584. Further the Court explained that, "although evidence of improper motive is irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case." *Id.* at 589, 118 S.Ct. 1584; *see also Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (plaintiff alleging retaliation for exercise of First Amendment rights must demonstrate that his conduct was constitutionally protected, and that this conduct was a substantial or motivating factor in defendant's adverse decision against plaintiff).

Defendants suggest that, to the extent that they can show that they had an objectively valid reason for their actions, they are entitled to summary judgment. However, the Court of Appeals suggested that this question had already been answered. *See* 199 F.3d at 502 ("[T]he District Court has found that no reasonable prison official could believe that interfering with an inmate's access to the press because of the content of the inmate's speech could be lawful."). In any event, the Court finds that defendants have failed to present objectively valid reasons for their conduct that would entitle them to summary judgment. Disputed issues of fact exist regarding the safety and disciplinary concerns asserted by defendants as justification for their conduct. As discussed below, plaintiff has presented sufficient evidence from which a jury could conclude that defendants did not harbor any concern for plaintiff's safety and that

no penological interest justified plaintiff's administrative detention.

The Court of Appeals remanded this case specifically for the this Court to determine if plaintiff could demonstrate that disputed facts exist as to whether defendants violated clearly established law, either by intentionally segregating plaintiff from the general prison population, or by interfering with plaintiff's ability to contact the press because of the content of his proposed speech. *See* 199 F.3d at 498. Plaintiff has identified genuine issues of fact regarding defendants' intent to interfere with his access to the press. He has also proffered evidence from which a reasonable jury could conclude that defendants were motivated in their actions by the content of his speech and proposed speech.

With respect to Mr. Miller, genuine issues of fact exist regarding his motivations in informing BOP officials of the fears allegedly relayed to him by Ms. Totenberg. In passing on information that, according to Ms. Totenberg, was false or at least vastly misleading, Mr. Miller presented BOP officials with a superficial justification for placing plaintiff in administrative detention, thus preventing the first scheduled press conference. Ms. Totenberg's testimony, for example, suggests that her conversations with Mr. Miller could not have reasonably led him to believe that plaintiff needed to be placed in administrative detention. Drawing all reasonable inferences in favor of plaintiff, a jury might well conclude that Mr. Miller's actions were motivated by the pressure he received from Bush–Quayle Campaign staff, and thus by the content of plaintiff's speech. Further, a jury might conclude that Mr. Miller knew that informing Director Quinlan that plaintiff feared for his safety would result in plaintiff being placed in administrative detention and, consequently, cancellation of the press conference.

With respect to Mr. Quinlan, genuine issues of fact exist regarding his motivation in ordering that plaintiff be placed in administrative detention on November 4 and his approval of plaintiff's detention on November 7. Plaintiff has presented sufficient evidence from which a jury might conclude that Mr. Quinlan ordered that plaintiff be placed in detention on both occasions with the specific intention of preventing plaintiff's planned contact with the press on November 5 and on November 7.

While defendants argue that Mr. Quinlan did not inform prison officials that he was concerned with the content of the press conferences, he was clearly aware of plaintiff's allegations regarding the vice presidential candidate at the time that he cancelled the first press conference. Because other evidence in the record casts significant doubt on Mr. Quinlan's explanation that the first press conference was cancelled because of a "policy" against such press conferences, a reasonable jury might well look beyond this justification to other record evidence that supports a conclusion that Mr. Quinlan was concerned with the content of Mr. Kimberlin's allegations and with the timing of the press conference. Similarly, a jury might find, based on plaintiff's evidence, that Mr. Quinlan placed him in administrative detention with the intention of keeping him from the press. Further, plaintiff's evidence suggests that it would be reasonable to conclude that Mr. Quinlan's approval of the imposition of detention as a sanction for an alleged "third-party call" violation was highly unusual, and was motivated by a desire to prevent the plaintiff's planned telephone call with members of the press.

Plaintiff, however, has not presented sufficient evidence to support his claim that defendants were involved in his detention on December 22. Indeed, nothing in the record suggests that Mr. Quinlan or Mr. Miller ordered this third administrative detention.

In sum, the record before this Court is rife with genuinely disputed facts regarding defendants' intentions. The Court is convinced that a reasonable jury could conclude that both Mr. Quinlan and Mr. Miller acted with improper motives in restricting plaintiff's access to the press and in placing him in administrative detention.

### Conclusion

For the foregoing reasons, and upon careful consideration of defendants' motion for summary judgment, the response and reply thereto, the entire record herein, and the applicable statutory and case law, the Court finds that plaintiff has identified " 'affirmative evidence from which a jury could find that [he] has carried his ... burden of proving' " that defendants Quinlan and Miller acted with a retaliatory motive. 199 F.3d at 502 (quoting *Crawford–El*, 523 U.S. at 600, 118 S.Ct. 1584). While plaintiff's evidence is not conclusive, it clearly presents genuine issues of material fact, which are properly committed to a jury's consideration. It is the province of the jury to determine the credibility of plaintiff's claims and the intentions of defendants Quinlan and Miller. This case shall proceed to trial. Accordingly, it is by the Court hereby

**ORDERED** that defendants' motion for summary judgment [184] is **DENIED**.

An appropriate Pre–Trial Order accompanies this Memorandum Opinion and Order.

### *PRE–TRIAL ORDER*

In light of the Memorandum Opinion filed today denying in defendants' motion for summary judgment, it is hereby

**ORDERED** that the parties shall file by no later than **March 14, 2003**, a Joint Pretrial Statement in strict compliance with Local Rules 16.5(b) and 16.5(d)(1), (2) & (3). The parties are directed to make good faith efforts to agree on proposed voir dire questions and jury instructions; it is

**FURTHER ORDERED** that Local Rule 16.5(e) objections shall be filed by each party by no later than **March 28, 2003**; it is

**FURTHER ORDERED** that responses to objections shall be filed by **April 11, 2003**; it is

**FURTHER ORDERED** that replies shall be filed by **April 22, 2003**; it is

**FURTHER ORDERED** that there shall be no surreplies; it is

**FURTHER ORDERED** that in order to aid the Court in the expeditious resolution of pretrial issues, the following format shall be adhered to for the filing of objections, responses, and replies: (1) Each party shall convert each item listed in Rule 16.5 into a 2–column table, fill in the left side of the table with the party's statement, list, designation, etc., and then serve all counsel with a computer floppy disk of this submission. Counsel shall certify that this version of the Rule 16.5 submission is identical to the one filed with the Court. (2) Opposing counsel shall file its Rule 16.5(e) objection by responding to each item point-by-point and filling in the right side of the table. A blank space will indicate to the Court that no objection exists. Two examples are provided below:

| CAPTION | |
|---|---|
| Plaintiff's Proposed Voir Dire | Defendants' Objections |
| 1. Do any of you, members of your family, or close friends have a personal or business relationship with any members of the Court, plaintiff or his counsel, or defendant or his counsel? | 1. [Blank] [Indicates agreement.] |
| 2. | 2. |

| CAPTION | |
|---|---|
| Defendant's Witness List | Plaintiff's Objections |
| 1. John Marshall, Chief Justice of the United States Supreme Court. Chief Justice Marshall will testify to his opinion in *Marbury v. Madison.* | 1. [Blank] [Indicates no objection.] |
| 2. | 2. |

It is **FURTHER ORDERED** that parties are directed not to cross-reference documents or base objections on statements made in previous pleadings or papers without quoting the relevant section in full, and it is

**FURTHER ORDERED** that a Pretrial Conference is scheduled in this case for **May 14, 2003 at 11:00 a.m.**; it is

**FURTHER ORDERED** that a Trial date will be scheduled at the Pretrial Conference.